**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KRISTINE DIVNEY, individually and on behalf of others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>DOORDASH INC. d/b/a/ CAVIAR and APPLE PAYMENTS SERVICES LLC,<br><br>Defendant. | Case No. 1:25-cv-05708-MMG<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT DOORDASH, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND STAY CASE**

GIBSON, DUNN & CRUTCHER LLP

Esther Lifshitz
elifshitz@gibsondunn.com
200 Park Avenue
New York, NY 10166
Phone: 213.229.7018

Michael Holecek (*PHV*)
mholecek@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Phone: 213.229.7000

*Attorneys for Defendant DoorDash, Inc.*

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

STATEMENT OF RELEVANT FACTS ........................................................................ 2

A. DoorDash's Online Marketplaces, Including Caviar, Connect Customers, Restaurants, and Dashers ........................................................................ 2

B. Divney Signed Up for a DoorDash Account and Thereby Agreed to Arbitrate Her Dispute Under the T&C ........................................................ 3

C. Divney Also Agreed to the T&C by Signing Up for DashPass in 2022 ................ 5

D. Divney Filed This Lawsuit Against DoorDash Notwithstanding Her Agreement to Arbitrate Her Disputes ........................................................ 8

LEGAL STANDARD ................................................................................................ 9

ARGUMENT ............................................................................................................ 9

A. The FAA Governs the Parties' Arbitration Agreement ...................................... 10

B. Divney Agreed to Arbitrate Her Dispute with DoorDash .................................. 11

C. The Arbitrator Must Resolve Any Challenges to the Scope and Validity of the Arbitration Agreement ........................................................................ 16

1. The Arbitrator Must Decide Any Challenges to the Agreement's Validity or Enforceability ........................................................................ 16

2. The Gateway Issues Under the FAA Are Satisfied ................................ 19

D. Alternatively, Divney's Claims Must Be Dismissed Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction ............................................................ 22

E. Divney's Claims Should Be Stayed While Arbitration Proceeds ........................ 23

CONCLUSION ........................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995) ... 11

*Arkin v. DoorDash, Inc.*,
2020 WL 4937825 (E.D.N.Y. Aug. 24, 2020) ... 1, 2, 17, 18, 21

*Badinelli v. Tuxedo Club*,
183 F. Supp. 3d 450 (S.D.N.Y. 2016) ... 21

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006) ... 10

*Camilo v. Lyft, Inc.*,
384 F. Supp. 3d 435 (S.D.N.Y. 2019) ... 11

*Cartagena Enters., Inc. v. J. Walter Thompson Co.*,
2013 WL 5664992 (S.D.N.Y. Oct. 16, 2013) ... 23

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) ... 11

*Contec Corp. v. Remote Solution Co.*,
398 F.3d 205 (2d Cir. 2005) ... 18

*Daly v. Citigroup, Inc.*,
939 F.3d 415 (2d Cir. 2019) ... 10

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*,
923 F.2d 245 (2d Cir. 1991) ... 22

*DIRECTV, Inc. v. Imburgia*,
577 U.S. 47 (2015) ... 10

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) ... 11, 13, 14

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) ... 21

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ... 1

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995) ... 19

*Foran v. NFL*,
2019 WL 2408030 (S.D.N.Y. June 7, 2019) ... 17, 21

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Fteja v. Facebook, Inc.*,
841 F. Supp. 2d 829 (S.D.N.Y. 2012)........15

*Harris v. TD Ameritrade Inc.*,
338 F. Supp. 3d 170 (S.D.N.Y. 2018)........22

*Hastings v. Nifty Gateway, LLC*,
724 F. Supp. 3d 241 (S.D.N.Y. 2024)........15, 16

*Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*,
372 F.2d 753 (2d Cir. 1967)........20

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019)........17

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002)........17

*Levy v. Credit Plus, Inc.*,
2023 WL 2644352 (S.D.N.Y. Mar. 27, 2023)........17

*Marciano v. DCH Auto Grp.*,
14 F. Supp. 3d 322 (S.D.N.Y. 2014)........20

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
514 U.S. 52 (1995)........10

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017)........9, 12, 13, 16

*Micheli & Shel, LLC v. Grubhub Inc., et al.*,
588 F. Supp. 3d 483 (S.D.N.Y. 2022)........1, 17, 18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)........9

*Newman v. SL Green Realty Corp.*,
2025 WL 1797043 (S.D.N.Y. June 26, 2025)........10, 15, 18, 19

*PaineWebber Inc. v. Bybyk*,
81 F.3d 1193 (2d Cir. 1996)........17

*Personalized Media Commc'ns, L.L.C. v. StarSight Telecast, Inc.*,
2000 WL 1457079 (S.D.N.Y. Sept. 28, 2000)........19, 20

*Peter v. DoorDash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020)........1, 11, 15

*Plazza v. Airbnb, Inc.*,
289 F. Supp. 3d 537 (S.D.N.Y. 2018)........11

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Porcelli v. JetSmarter, Inc.*,
2019 WL 2371896 (S.D.N.Y. June 5, 2019) ....17

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010) ....16, 17, 20

*Reznik v. Coinbase, Inc.*,
2024 WL 1055002 (S.D.N.Y. Mar. 11, 2024) ....9, 16, 22

*Rosehoff Ltd. v. Cataclean Americas LLC*,
2013 WL 2389725 (W.D.N.Y. May 30, 2013) ....23

*Scherck v. Alberto-Culver Co.*,
417 U.S. 506 (1974) ....23

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
322 F.3d 115 (2d Cir. 2003) ....9, 16

*Smith v. Spizzirri*,
601 U.S. 472 (2024) ....23

*Starke v. Gilt Groupe, Inc.*,
2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ....14

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
592 F.3d 329 (2d Cir. 2010) ....21

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960) ....19, 21

*VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*,
717 F.3d 322 (2d Cir. 2013) ....11

**Statutes**

9 U.S.C. § 2 ....9, 10

9 U.S.C. § 3 ....2, 10, 23

9 U.S.C. § 4 ....1, 9, 10

**Rules**

Fed. R. Civ. P. 12(b)(1) ....2, 22, 23

Fed. R. Civ. P. 12(b)(6) ....2

## INTRODUCTION

Plaintiff Kristine Divney has consumer accounts for the DoorDash and Caviar Online Marketplaces operated by Defendant DoorDash, Inc., and has placed orders using both services. She alleges DoorDash charged her for its subscription service, DashPass, which provides reduced fees on orders, without her authorization. *See* Divney Complaint ("Compl.") ¶¶ 28–31. She purports to represent a class of similarly situated consumers who received unauthorized charges for a DashPass subscription via Apple Pay. *Id.* ¶ 43. DoorDash disputes Divney's claims, but these claims must be arbitrated and thus cannot proceed in this Court. Although Divney alleges she has never signed up for a DoorDash account, DoorDash's records reflect that she signed up for DoorDash in 2015, and signed up for, and received the benefits of, a free DashPass trial through her Caviar account in 2022 (before canceling prior to renewal without charge). Declaration of Brian Cramer ("Cramer Decl."), ¶¶ 8, 14. On both of these occasions, Divney agreed to DoorDash's Consumer Terms and Conditions ("T&C"), which state, at the top of the first page, that the parties must arbitrate all disputes. The T&C also delegate all issues of arbitrability to the arbitrator. In agreeing to the T&C, Divney consented to arbitrate all disputes with DoorDash. This Court should compel Divney to arbitrate her claims per the terms of the agreement.

The Federal Arbitration Act ("FAA") requires courts to "enforce arbitration agreements according to their terms." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018); *see also* 9 U.S.C. § 4. Every court that has evaluated DoorDash's T&C has compelled individual consumers to arbitrate their disputes with DoorDash. *See, e.g.*, *Arkin v. DoorDash, Inc.*, 2020 WL 4937825, at *5 (E.D.N.Y. Aug. 24, 2020); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 587 (N.D. Cal. 2020). This Court should do the same. The T&C are valid and enforceable under the FAA and New York law, and they cover Divney's claims—and, in any event, the parties agreed to delegate all disputes over arbitrability to an arbitrator. *See Micheli & Shel, LLC v. Grubhub Inc., et al.*, 588 F. Supp.

3d 483, 490 (S.D.N.Y. 2022) (enforcing delegation clause in DoorDash's merchant Terms); *Arkin*, 2020 WL 4937825, at *5 (enforcing delegation clause in DoorDash's T&C).

DoorDash respectfully requests that the Court compel Divney to arbitrate her claims, stay the action pending the resolution of this motion, and stay all further proceedings pending completion of arbitration. A stay of arbitration is required under both the FAA. *See* 9 U.S.C. § 3. In the alternative, DoorDash moves this Court to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.[1]

## STATEMENT OF RELEVANT FACTS

### A. DoorDash's Online Marketplaces, Including Caviar, Connect Customers, Restaurants, and Dashers

DoorDash is a technology company headquartered in San Francisco that facilitates food ordering and delivery through its Online Marketplaces, which include DoorDash and Caviar. Cramer Decl. ¶ 3. DoorDash has owned and operated Caviar since 2019. *Id.* ¶ 4. The Online Marketplaces connect consumers, a broad array of restaurants and other merchants, and independent-contractor delivery providers, called "Dashers." *Id.* Consumers can access the Online Marketplaces via the DoorDash and Caviar websites or mobile applications. *Id.* ¶ 3.

DoorDash offers a subscription service called DashPass, which provides consumers reduced fees on qualifying orders. *Id.* ¶ 5. Consumers may sign up for, and use, DashPass benefits on the DoorDash and Caviar websites or apps. *Id.* The DashPass sign-up process is materially similar on the Caviar app and the DoorDash app, and on the DoorDash website and Caviar website. *Id.*

---

[1] DoorDash reserves its right to file a motion under Fed. R. Civ P. 12(b)(6) in the event that the Court denies its motion to compel arbitration. And to the extent the Court finds that factual disputes exist that prevent this motion from being decided on the pleadings and existing record, DoorDash reserves the right to seek discovery from Divney on issues of arbitrability.

## B. Divney Signed Up for a DoorDash Account and Thereby Agreed to Arbitrate Her Dispute Under the T&C

Divney signed up for a DoorDash consumer account on or about September 1, 2015, placing an order the same day, and in the process agreed to the then-operative T&C ("2015 T&C"). Cramer Decl. ¶¶ 8–12. To sign up for a DoorDash consumer account in September 2015, Divney had to fill in her name, email address, phone number, and a password on one of the two sign-up screens shown below. *Id.* ¶ 9 & Ex. A.

**<u>DoorDash Sign Up Screens (September 2015)</u>**






Upon completing these fields, Divney had to click "Sign Up" to create an account. When Divney signed up in September 2015, directly adjacent to the "Sign Up" button on the account sign-up screens was the statement: "By signing up, you agree to our Terms and Conditions." Cramer Decl. ¶ 9 & Ex. A. The words "Terms and Conditions" were in red font and hyperlinked to the 2015 T&C, affording Divney an opportunity to review those terms before indicating her agreement to them. *Id.* Divney could not have placed a DoorDash order without first filling out the sign-up page information and clicking her agreement to the then-operative T&C. *Id.* ¶ 12. When Divney clicked "Sign Up," she agreed to the 2015 T&C.

The 2015 T&C contained a Dispute Resolution provision providing that the parties will

mediate and, if necessary, arbitrate any disputes, including those relating to Divney's use of DoorDash's Service. Specifically, the 2015 T&C's "Dispute Resolution" provision states:

> The parties shall first attempt to resolve any dispute related to this Agreement in an amicable manner by mediation with a mutually acceptable mediator. . . . Any disputes remaining unresolved after mediation shall be settled by binding arbitration conducted in San Francisco, California utilizing a mutually agreed arbitrator or arbitration service. . . .

Cramer Decl. Ex. B at 4.

The 2015 T&C also provide that continued use of "any services supplied by" DoorDash would constitute consent to any updated terms. *See id.* at 1 (Divney "expressly acknowledge[d] and agree[d] to be bound by the terms and conditions of the Agreement, and any future amendments and additions to this Agreement as published from time to time at https://www.doordash.com/terms or through the Service"). DoorDash "reserve[d] the right to modify the terms and conditions of this Agreement or its policies relating to the Service or Software at any time" and told Divney that she was "responsible for regularly reviewing this Agreement" because "[c]ontinued use of the Service or Software after any such changes shall constitute your consent to such changes." *Id.*

**C. Divney Also Agreed to the T&C by Signing Up for DashPass in 2022**

In addition to her DoorDash account, Divney created a Caviar account on March 15, 2015. Cramer Decl. ¶ 13. Divney again assented to DoorDash's T&C by using this account to sign up for a DashPass free trial through the Caviar app in August 2022. *Id.* ¶ 14.

The image below depicts DoorDash's August 2022 DashPass sign-up screen on the DoorDash app, which was materially the same as the DashPass sign-up screen on the Caviar app at the time. *Id.* ¶ 14; *see also* Compl. Ex. A (materially similar current Caviar DashPass signup screen submitted by Divney). This screen included a similarly conspicuous disclosure regarding the T&C, which stated in relevant part, right above the "Get DashPass" button, that "By tapping

the button, I agree to the **<u>Terms</u>**." *Id.* ¶ 14 & Ex. C. The word "Terms" was bolded, underlined, and hyperlinked to the then-operative T&C (the "July 2022 T&C"). *Id.*

**<u>DashPass Sign Up Screen (August 2022)</u>**




On August 13, 2022, Divney tapped the "Get DashPass" button and thereby agreed to DoorDash's July 2022 T&C. Cramer Decl. ¶¶ 14, 16.

The July 2022 T&C prominently put Divney on notice of the arbitration agreement contained therein. The first page of the July 2022 T&C included capitalized text reading:

> SECTION 12 [hyperlink] OF THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS THAT YOU AND WE HAVE AGAINST EACH OTHER ARE RESOLVED, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS THAT AROSE OR WERE ASSERTED BEFORE THE EFFECTIVE DATE OF THIS AGREEMENT. IN PARTICULAR, SECTION 12 SETS FORTH OUR ARBITRATION AGREEMENT WHICH WILL, WITH LIMITED EXCEPTIONS, REQUIRE DISPUTES BETWEEN US TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION.

Cramer Decl. Ex. D at 1. Divney "agree[d] that any dispute or claim relating in any way to [her] access or use of the Services as a User of [DoorDash's] Services," to "advertising or marketing communications regarding DoorDash or [its] Services," to "any products or services sold or distributed through [DoorDash's] Services," or to "any aspect of [her] relationship or transactions with DoorDash" would be "resolved by binding arbitration, rather than in court[.]" *Id.* § 12(a).

The July 2022 T&C define "Services" to include "access[ing] any of our websites located at https://www.doordash.com and https://trycaviar.com, install[ing] or us[ing] [the] DoorDash or Caviar mobile application, install[ing] or us[ing] any other software supplied by DoorDash, . . . access[ing] any information, function, or service available or enabled by DoorDash . . . or complet[ing] the DoorDash account registration process[.]" *Id.* § 1.

The arbitration agreement in the July 2022 T&C also contains a delegation clause stating that "[t]he arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement[.]" *Id.* § 12(d).

Moreover, the July 2022 T&C included a modification provision, informing Divney that:

> DoorDash reserves the right to modify the terms and conditions of this Agreement or its policies relating to the Software or Services at any time, effective upon posting of an updated version of this Agreement through the Services. You should regularly review this Agreement, as your continued use of the Services after any such changes constitutes your agreement to such changes.

*Id.* § 2. As a result, when Divney agreed to the July 2022 T&C, she also agreed that her continued use of DoorDash services would constitute agreement to any updated published version of the T&C.[2]

Divney placed 29 orders on her Caviar account in or after August 2022, when she signed up for DashPass and assented again to the DoorDash T&C, including placing six orders using her DashPass free trial benefits with reduced fees before successfully canceling the trial prior to renewal without having been charged. Cramer Decl. ¶¶ 17, 18. There are no DashPass charges in 2025 or at any other time on Divney's DoorDash or Caviar accounts associated with the email provided in her Complaint, and Divney's counsel did not timely provide additional information to help DoorDash locate the purported charges. Cramer Decl. ¶ 22; Holecek Decl. ¶ 4. Divney's most recent order was placed on August 5, 2025 from her Caviar account, after DoorDash's most recent July 15, 2025, T&C update—*and after she filed suit in this case*. Cramer Decl. ¶¶ 17, 19.

In sum, Divney repeatedly agreed to the T&C, including by signing up for her DoorDash account on September 1, 2015, Cramer Decl. ¶ 8, and subscribing to DashPass on August 13, 2022, *id.* ¶ 14. Divney further manifested her assent to each new version of the T&C by continuing to use DoorDash's Online Marketplaces, including by placing an order as recently as August 5, 2025. *Id.* ¶¶ 17, 19. Therefore, Divney is bound by the DoorDash T&C, and must arbitrate her claims.

### D. Divney Filed This Lawsuit Against DoorDash Notwithstanding Her Agreement to Arbitrate Her Disputes

Despite repeatedly agreeing to arbitrate her disputes with DoorDash, Divney filed this

---

[2] Like most companies, DoorDash occasionally updates the T&C, and it did so on several occasions after Divney signed up for DoorDash's online Marketplaces and DashPass, including on July 15, 2025 ("July 2025 T&C"). Cramer Decl. ¶ 19 & Ex. E. Each time DoorDash updated the T&C, it posted the updated terms on the DoorDash and Caviar websites. *Id.* ¶ 19. Like the 2015 T&C, every subsequent version of the T&C included (i) an arbitration agreement between DoorDash and the consumer, and (ii) a modification provision that made subsequent versions of the T&C effective upon posting on DoorDash's website. *Id.*

lawsuit against DoorDash and Apple on June 6, 2025, claiming, among other things, that DoorDash fraudulently charged her for a DashPass subscription in May 2025. Compl. ¶¶ 28–32. She also alleges that DoorDash charges consumers without consent for DashPass and makes it difficult to cancel subscriptions. *Id.* ¶ 34. She further alleges that Apple represented that it would not charge her credit card through Apple Pay without Face ID authorization. *Id.* ¶ 36. Divney, who is a paralegal at the law firm representing her in this case, seeks to represent a class of similarly situated consumers, *id.* ¶ 43, and seeks damages, *id.* at 15–16. *See* Decl. of Michael Holecek ("Holecek Decl."), Ex. A (website of firm listing Divney as a "Paralegal").

## LEGAL STANDARD

"The FAA 'reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts.'" *Reznik v. Coinbase, Inc.*, 2024 WL 1055002, *3 (S.D.N.Y. Mar. 11, 2024) (Garnett, J.) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017)). Under Section 2, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 provides that parties can petition a district court for an order compelling arbitration. 9 U.S.C. § 4. "The role of the courts is 'limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.'" *Reznik*, 2024 WL 1055002, *3 (Garnett, J.) (quoting *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

## ARGUMENT

Divney repeatedly agreed to DoorDash's T&C, which include an agreement to arbitrate all disputes with DoorDash under the FAA. To the extent Divney challenges the arbitration

agreement's enforceability or applicability to this dispute, the parties agreed to delegate those issues for the arbitrator—not this Court—to decide. This Court should accordingly compel arbitration and stay this action.

**A. The FAA Governs the Parties' Arbitration Agreement**

The FAA requires courts, upon motion, to compel arbitration "in accordance with the terms" of a valid agreement to arbitrate. 9 U.S.C. § 4; *see Newman v. SL Green Realty Corp.*, 2025 WL 1797043, *3 (S.D.N.Y. June 26, 2025) (Garnett, J.) ("The FAA 'leaves no place for the exercise of discretion by a district court,' instead mandating 'arbitration on issues as to which an arbitration agreement has been signed.'" (quoting *Daly v. Citigroup, Inc.*, 939 F.3d 415, 421 (2d Cir. 2019))). If the court is satisfied that a plaintiff's claims are "referable to arbitration under an agreement in writing," it "shall on application of one of the parties stay" the action, 9 U.S.C. § 3, and order arbitration to "proceed in the manner provided for" in the agreement, *id.* § 4.

The FAA governs the arbitration agreement in DoorDash's T&C for two independent reasons. ***First***, that agreement expressly states that it "is governed by the Federal Arbitration Act ('FAA') in all respects." Cramer Decl. Ex. D § 12(c). Courts routinely give effect to parties' agreements to be bound by the FAA. *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442–43, 449 (2006) (holding that "a challenge to the validity of [a] contract as a whole" was for arbitrator to decide where agreement stated it was governed by FAA); *Mastrobuono v. Shearson Lehman Hutton, Inc*., 514 U.S. 52, 62–64 (1995) (resolving "ambiguities as to the scope of the arbitration clause . . . in favor of arbitration" where agreement stated it was governed by FAA); *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 58–59 (2015).

***Second***, the FAA applies to any agreement with an arbitration clause that concerns a transaction "involving commerce," 9 U.S.C. § 2, as DoorDash's agreement with Divney does. The FAA's reach is "expansive[]," "coinciding with that of the Commerce Clause." *Allied-Bruce*

*Terminix Cos. v. Dobson*, 513 U.S. 265, 274 (1995); *accord Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). Courts regularly apply the FAA where, as here, a contract concerns transactions made over the internet. *See, e.g.*, *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 439 (S.D.N.Y. 2019) (FAA governed contract "pertain[ing] to internet transactions and rideshare services"); *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 705 (2d Cir. 2023) (FAA governed contract for online payment service); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548 (S.D.N.Y. 2018) (FAA governed contract regarding internet transactions for property rentals).

As stated above, DoorDash connects consumers, a broad array of restaurants and other merchants, and Dashers. Cramer Decl. ¶ 3. Consumers may access DoorDash's Online Marketplaces via the DoorDash and Caviar websites or the DoorDash and Caviar apps. *Id.* Dashers typically receive delivery opportunities via the DoorDash and Caviar apps on their smartphones or other mobile devices, or via the DoorDash and Caviar websites. *Id.* And DoorDash conducts business in all 50 states, the District of Columbia, and internationally. *See id.* Accordingly, the FAA applies. *See, e.g.*, *Peter*, 445 F. Supp. 3d at 583 (FAA governs DoorDash's T&C).

**B. Divney Agreed to Arbitrate Her Dispute with DoorDash**

The Court should compel Divney to arbitrate her dispute with DoorDash because Divney agreed to do so. Whereas the arbitrator decides "questions of arbitrability" delegated to it by the parties, courts decide "whether the parties agreed to arbitrate in the first place." *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 326 n.2 (2d Cir. 2013). Because the parties here agreed to delegate threshold issues of arbitrability to the arbitrator, Cramer Decl. Ex. D § 12(d), the only question for the Court to decide is whether the parties entered into a contract that included an arbitration agreement. So long as the plaintiff had "[r]easonably conspicuous notice of the existence of contract terms" and made an "unambiguous

manifestation of assent to those terms," a contract to arbitrate "has been formed." *Meyer*, 868 F.3d at 75.

That question is easily resolved here because Divney repeatedly agreed to the DoorDash T&C through her use of DoorDash's Online Marketplaces. *See supra* pp. 3–9. She first agreed to the T&C when she initially signed up for DoorDash, and again when she signed up for DashPass on Caviar in 2022. Cramer Decl. ¶¶ 8, 14. Each time she received conspicuous notice of the T&C and unambiguously agreed to be bound by them. Moreover, she continued to place orders using DoorDash's Online Marketplaces, most recently on August 5, 2025, after filing this lawsuit. *Id.* ¶¶ 17, 18, 19. And, as a Caviar consumer, she also would have received an email from DoorDash in June 2020 informing her of updates to DoorDash's T&C, including modifications to the arbitration provision. *Id.* ¶ 20 & Ex. F.

Courts routinely enforce "sign-in-wrap" agreements like DoorDash's. A sign-in-wrap agreement is an online agreement that "notif[ies] the user of the existence of the website's terms of use" and "advise[s] the user that he or she is agreeing to the terms of service when registering or signing up." *Meyer*, 868 F.3d at 75–76. Sign-in-wrap agreements are valid where "the existence of the terms was reasonably communicated to the user." *Id.* at 76. In *Meyer*, for example, the Second Circuit held that Uber's sign-in-wrap agreement was reasonably communicated to users, and that users thus agreed to arbitrate by signing in to the service, because (1) the design of the screen was "uncluttered," (2) the language in the prompt informed users that, "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY," (3) this text appeared directly below the button for registration, and (4) the entire sign-in screen, including the hyperlinked terms, was visible without scrolling. 868 F.3d at 78–79.

| *Meyer* Registration Prompt[3] | DoorDash September 2015 Mobile Sign-in Prompt |
|---|---|
|  |  |





Similarly, in *Edmundson v. Klarna, Inc.*, the Second Circuit held that a sign-in-wrap agreement was reasonably communicated to users because (1) the interface was "uncluttered," (2) the sign-in page was fully visible without scrolling, (3) the hyperlink was underlined and in black text on white background, (4) the hyperlink to the terms appeared near the sign-up button, and (5) the interface featured the language "I agree to the payment terms." 85 F.4th at 705–06.

[3] *Meyer*, 868 F.3d at 81.

| *Edmundson* Sign-in Prompt[4] | DoorDash September 2015 Mobile Sign-in Prompt |
|---|---|
|  |  |





Courts in this District regularly find that parties agreed to arbitrate through sign-in-wrap agreements. For instance, one court enforced a sign-in-wrap agreement where the user clicked "Shop Now" after being informed that, by doing so, "you agree to the Terms of Membership." *Starke v. Gilt Groupe, Inc.*, 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014). Another court held that a user assented to arbitrate when she clicked a sign-up button above the words, "By

[4] *Edmundson*, 85 F.4th at 705.

clicking Sign Up, you are indicating that you have read and agree to the [hyperlinked] Terms of Service." *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835, 838–39 (S.D.N.Y. 2012). Yet another court applied the analysis in *Meyer* to enforce an agreement where the sign-up screen read, "[b]y signing up, you agree to the Terms and Conditions and Privacy Policy." *Hastings v. Nifty Gateway, LLC*, 724 F. Supp. 3d 241, 249 (S.D.N.Y. 2024).

The screens through which Divney signed up for DoorDash and DashPass are similar in all relevant respects to the prompts in cases where the Second Circuit and courts in this District, including this Court, have found notice of terms of use to be reasonably conspicuous. *See, e.g.*, *Newman*, 2025 WL 1797043, *6 (finding reasonably conspicuous notice where the page was "uncluttered," the hyperlink was "in red print, in sharp contrast to both the white background of the page and the black text of the rest of the paragraph"; and the consent mechanism was "spatially and temporally coupled with the hyperlink"). DoorDash's interfaces are uncluttered, with only a few fields and buttons, and with the T&C disclosure directly above or adjacent to the "Sign Up" button. Cramer Decl. ¶¶ 9, 14 & Exs. A, C. The hyperlink to the T&C was conspicuous, set off from both the background and the surrounding text by a combination of bolding, underlining, and contrasting colors. *Id.* DoorDash informed potential customers that, by signing up (or tapping "Get DashPass"), they were agreeing to DoorDash's T&C. *Id.* In fact, in holding that DoorDash's sign-up interface was reasonably conspicuous, the court in *Peter* noted that "DoorDash's sign-up page looks markedly similar to the page approved by *Meyer*." 445 F. Supp. 3d at 586. "The screens are similarly uncluttered and wholly visible, and the notice text appears even closer to the sign-up button on DoorDash's page than on Uber's." *Id.*

In addition, the T&C themselves clearly inform the consumer, on the very first page, in bold, all-capitalized font, that they contain an arbitration agreement. Cramer Decl. Ex. D at 1.

Numerous courts have found that plaintiffs agreed to arbitrate where they consented to terms that featured conspicuous notice of the arbitration agreement. In *Meyer*, for example, the Second Circuit enforced a sign-in-wrap agreement and found that the arbitration clause was conspicuous because the arbitration clause in the terms of service was bolded. 868 F.3d at 79. And in *Hastings* the court noted in enforcing a sign-in-wrap agreement that "Paragraph 17 of the terms of use is titled 'Disputes' in a large font and begins by instructing users to '[p]lease read the following agreement to arbitrate . . . in its entirety.'" 724 F. Supp. 3d at 249.

Divney agreed to arbitrate with DoorDash, and the Court should hold her to her agreement and grant the motion to compel arbitration.

### C. The Arbitrator Must Resolve Any Challenges to the Scope and Validity of the Arbitration Agreement

To the extent Divney argues that the arbitration agreement is invalid or does not cover this dispute, the parties delegated these issues to the arbitrator. *See Reznik*, 2024 WL 1055002, *3 (Garnett, J.) ("The role of the courts is 'limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.'" (quoting *Shaw*, 322 F.3d at 120)). In any event, the parties' agreement is valid, and the dispute at issue is clearly within its scope. The Court should accordingly compel arbitration and stay this action.

#### 1. The Arbitrator Must Decide Any Challenges to the Agreement's Validity or Enforceability

Because the parties agreed to delegate all issues of arbitrability to the arbitrator, Cramer Decl. Ex. D § 12(d), any issues Divney may raise about the validity or scope of the parties' agreement are for the arbitrator to decide. The Supreme Court has upheld the delegation of "'gateway' questions of 'arbitrability,'" including whether the parties formed an arbitration agreement and "whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc.*

*v. Jackson*, 561 U.S. 63, 68–69 (2010). "An agreement to arbitrate a gateway issue is simply an additional antecedent agreement the party seeking arbitration asks the court to enforce." *Id.* at 70. If the parties "clearly and unmistakably" agree to delegate questions of arbitrability to the arbitrator, the arbitrator must decide threshold issues. *Levy v. Credit Plus, Inc.*, 2023 WL 2644352, at *9 (S.D.N.Y. Mar. 27, 2023) (enforcing delegation clause and granting motion to compel arbitration); *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (similar); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019) (similar).

Courts regularly uphold delegation clauses in arbitration agreements. *See, e.g.*, *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1202 (2d Cir. 1996); *Foran v. NFL*, 2019 WL 2408030, at *2–3 (S.D.N.Y. June 7, 2019); *Micheli*, 588 F. Supp. 3d at 490; *Arkin*, 2020 WL 4937825, at *5. For example, the Second Circuit "conclude[d] that the parties intended to arbitrate the issue of arbitrability" in a dispute between a bank and two of its customers because the parties' agreement stated that they would arbitrate "any and all controversies which may arise" concerning the customers' account. *PaineWebber Inc.*, 81 F.3d at 1195, 1202. The court reasoned that "[t]he words 'any and all'" in a delegation clause "are elastic enough to encompass disputes over whether a claim is timely and whether a claim is within the scope of arbitration." *Id.* at 1199.

As another example, this Court similarly found that questions about the validity of an arbitration agreement were for the arbitrator to resolve because the agreement provided that "*any* dispute arising out of or related to this Agreement . . . shall be referred to final and binding arbitration pursuant to the procedures of the American Arbitration Association." *Foran*, 2019 WL 2408030, at *2–3 (emphasis added); *see also Porcelli v. JetSmarter, Inc.*, 2019 WL 2371896, at *4 (S.D.N.Y. June 5, 2019) (parties delegated arbitrability to arbitrator where delegation clause required that "'any' dispute be resolved through arbitration").

In a case against DoorDash, this Court held that the 2020 version of DoorDash's Merchant Terms of Service "plainly delegates the question of arbitrability to the arbitrator." *Micheli*, 588 F. Supp. 3d at 490. Those terms stated the arbitrator "shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement." *Id.* And a court in the Eastern District of New York similarly held that it "may not reach Plaintiff's unconscionability argument because the parties have clearly and unmistakably agreed to delegate issues of enforceability of the arbitration agreement to the arbitrator" based on identical language in DoorDash's T&C. *Arkin*, 2020 WL 4937825, at *5.

Here, the Court should likewise enforce the delegation clause to which the parties agreed. The T&C to which Divney agreed contain a delegation clause with language identical to that in *Micheli* and *Arkin*, providing that "[t]he arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve *any dispute* relating to the interpretation, applicability, enforceability or formation of this Arbitration Agreement." Cramer Decl. Ex. D § 12(d) (emphasis added).

Moreover, the T&C expressly incorporate the arbitration providers' rules, which separately delegate questions of arbitrability to the arbitrator. The Second Circuit has held that, where the parties "explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *see also Newman*, 2025 WL 1797043, at *9–10. For example, the July 2022 T&C provide that "[d]isputes shall be subject to" ADR's current Arbitration Rules. Cramer Decl. Ex. D § 12(c). The ADR rules contain a clear delegation clause: "[T]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity

of the arbitration agreement." *See* Holecek Decl. Ex. B at 5 (ADR Arbitration Rule 8). The express incorporation of the ADR rules constitutes further clear and unmistakable evidence of the parties' intent to arbitrate the threshold issue of arbitrability. *See Newman*, 2025 WL 1797043, at *9–10. The Court should enforce this agreement and allow the arbitrator to resolve any disputes about arbitrability.

**2. The Gateway Issues Under the FAA Are Satisfied**

Given the unmistakable delegation clause in the T&C, the arbitrator, and not this Court, should determine the "gateway" issues of the validity and scope of the parties' arbitration agreement. But even if the Court resolves arbitrability issues, it should still compel Divney to arbitrate because both "gateway" issues under the FAA are met. The arbitration agreement is a valid contract, satisfying all the requirements of New York law. And its terms clearly cover Divney's claims because those claims arise out of DoorDash's services.

**a. The Arbitration Agreement Is a Valid Contract**

Though the validity of the parties' contract is for the arbitrator and not the Court to decide, there can be no doubt that the arbitration agreement in this case is in fact valid. "[A]rbitration is a matter of contract," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960), governed by ordinary state-law contract principles, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under the law of New York—where Divney resides and where the contract was both formed and performed—"[a] contract is enforceable if there is a meeting of the minds between the parties regarding material elements of the agreement." *Personalized Media Commc'ns, L.L.C. v. StarSight Telecast, Inc.*, 2000 WL 1457079, at *3 (S.D.N.Y. Sept. 28, 2000) (cleaned up) (compelling arbitration). Those material elements "include the identification of the parties, a sufficient description of the subject matter, and consideration." *Id.* The parties' arbitration agreement meets these requirements.

***First***, the T&C clearly identify the parties, noting on the first page that the T&C "CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND DOORDASH." Cramer Decl. Ex. D at 1.

***Second***, the T&C sufficiently describe the subject matter of the arbitration agreement, stating in part that "[y]ou agree that any dispute or claim arising out of or relating in any way to . . . your access or use of the Services as a User of the Services . . . will be resolved by binding arbitration, rather than in court." *Id.* Ex. D § 12(a).

***Third***, the arbitration agreement is supported by valid consideration: the parties' mutual promises to arbitrate disputes. *Id.* Ex. D § 12(a). Courts routinely find that mutual promises to arbitrate satisfy the consideration requirement. *E.g.*, *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 337 (S.D.N.Y. 2014) (compelling arbitration and finding that "the [Arbitration] Agreement by itself contains sufficient consideration because . . . it mutually binds both parties to submit claims exclusively to arbitration"); *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir. 1967) (party's "promise to arbitrate was sufficient consideration to support [other party's] promise to arbitrate").

There has been a "meeting of the minds" as to each of these essential elements. *Personalized Media*, 2000 WL 1457079, at *3. In signing up for DoorDash and DashPass, Divney affirmatively acknowledged her intent—after ample opportunity for review—to be bound by the arbitration agreement in the T&C.

In sum, the parties' agreement to arbitrate is valid and enforceable. Divney does not allege that the arbitration agreement is unenforceable and, in any event, such an argument would likewise be for the arbitrator to decide. Absent a successful challenge to the delegation clause itself, the clause remains enforceable. *Rent-a-Center*, 561 U.S. at 72 (reserving questions of arbitrability for

arbitrator where the plaintiff did not "challenge[] the delegation provision specifically"); *see also Foran*, 2019 WL 2408030 at *2–3 (similar). In *Arkin*, for instance, the court rejected such challenges to DoorDash's T&C, reasoning that "the court may not reach Plaintiff's unconscionability argument because the parties have . . . agreed to delegate issues of enforceability of the arbitration agreement to the arbitrator." 2020 WL 4937825, at *5. The same holds true here.

**b. The Arbitration Agreement Covers Divney's Claims**

Whether Divney's claims come within the scope of the parties' arbitration agreement is also for the arbitrator, and not the Court, to decide, because the parties specifically delegated that question to the arbitrator. *See Arkin*, 2020 WL 4937825, at *4–5. But, if the Court weighs in on this issue, it should hold that the agreement covers Divney's claims.

"Absent some ambiguity in the agreement . . . it is the language of the contract that defines the scope of disputes subject to arbitration." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). "To determine whether the parties intended to submit a given matter to arbitration, the general rule is that courts 'should apply ordinary state-law principles that govern the formation of contracts,'" *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 344 (2d Cir. 2010), keeping in mind that both New York law and the FAA "strongly favor enforcing arbitration agreements," *Badinelli v. Tuxedo Club*, 183 F. Supp. 3d 450, 453 n.1 (S.D.N.Y. 2016). Disputes are covered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers*, 363 U.S. at 582–83. That is, "[d]oubts should be resolved in favor of coverage." *Id.* at 583. For instance, in a case where the parties agreed to arbitrate "all disputes arising out of or in relation to" a trading agreement, the Second Circuit compelled arbitration of a dispute over a separate agreement the parties had entered into because that separate agreement "stemmed" from the trading agreement.

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 250–52 (2d Cir. 1991). Likewise, in *Reznik*, 2024 WL 1055002, *3 (Garnett, J.), this Court found that the company's alleged failure to prevent an unauthorized transaction "undoubtedly" related to the company's services, and therefore must be arbitrated.

There is no ambiguity here. Divney agreed to arbitrate "any dispute or claim relating in any way to" (1) her "access or use" of the DoorDash Online Marketplaces, including DashPass, (2) "any advertising or marketing communications" regarding the DoorDash Online Marketplaces, including DashPass, (3) "any products or services sold or distributed through" DoorDash, including DashPass, and (4) "any aspect of [her] relationship or transactions with DoorDash," including DashPass. Cramer Decl. Ex. D § 12(a). Divney alleges that DoorDash fraudulently charged her for DashPass and misrepresented that she could cancel DashPass "anytime." Compl. ¶ 23. This is a dispute relating to Divney's use of DoorDash's Online Marketplaces and associated products and services, and to Divney's relationship and transactions with DoorDash. Thus, Divney's claims fall squarely within the scope of the T&C arbitration agreement.

### D. Alternatively, Divney's Claims Must Be Dismissed Under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction

The Court may also choose to treat this motion as a motion to dismiss Divney's claims pursuant to Federal Rule of Civil Procedure 12(b)(1), given that, for the reasons set forth above, this Court lacks jurisdiction to hear Divney's claims. *See Harris v. TD Ameritrade Inc.*, 338 F. Supp. 3d 170, 181 (S.D.N.Y. 2018) ("[B]ecause a motion to compel arbitration goes to the Court's power to hear a case, such a motion is analogous to—and sometimes treated as—a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1)."). If the Court does not compel Divney to arbitrate her claims, it should dismiss those claims for lack of subject-matter jurisdiction.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Rosehoff Ltd. v. Cataclean Americas LLC*, 2013 WL 2389725, at *6 (W.D.N.Y. May 30, 2013) (internal quotation marks omitted). To prevail on a Rule 12(b)(1) motion, the "plaintiff bears the burden of proving subject matter jurisdiction." *Cartagena Enters., Inc. v. J. Walter Thompson Co.*, 2013 WL 5664992, at *3 (S.D.N.Y. Oct. 16, 2013) (cleaned up) (granting motion to dismiss and compel arbitration under Rule 12(b)(1)). In ruling on a Rule 12(b)(1) motion, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," and, in fact, the court may take into account "evidence outside the pleadings." *Id.* (cleaned up).

Divney cannot carry her burden to show that this Court has jurisdiction over her claims. For the reasons discussed above, she repeatedly entered into the arbitration agreement contained in the T&C. *Supra* pp. 11–16, 19–21. She cannot assail the Parties' unmistakable delegation clause, which reserves questions of arbitrability for the arbitrator. *Supra* pp. 16–19. And, even if she could, she could not argue that her claims fall outside the arbitration agreement's scope. *Supra* pp. 21–22. This Court therefore lacks subject matter jurisdiction over Divney's claims.

**E. Divney's Claims Should Be Stayed While Arbitration Proceeds**

The FAA provides that a court, upon granting a motion to compel, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."); *Scherck v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (the FAA "provides in § 3 for a stay of proceedings in a case where a court is satisfied that the issue before it is arbitrable under the agreement"). DoorDash

respectfully requests that the Court stay this case pending completion of arbitration.

## CONCLUSION

Courts consistently compel arbitration and stay proceedings when DoorDash moves to compel arbitration under its arbitration agreements. There is no reason for a different result here. The Court should compel Divney to arbitration and stay all further proceedings pending completion of arbitration.

Dated: August 18, 2025

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Esther Lifshitz*

GIBSON, DUNN & CRUTCHER LLP

Esther Lifshitz
elifshitz@gibsondunn.com
200 Park Avenue
New York, NY 10166
Phone: 213.229.7018

Michael Holecek (*PHV*)
mholecek@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Phone: 213.229.7000

*Attorneys for Defendant DoorDash, Inc.*

**CERTIFICATION**

I hereby certify, pursuant to Local Rule 7.1(c) and section II.B of the Court's Individual Rules of Practice, that this memorandum of law contains 6,581 words.

By: */s/ Esther Lifshitz*

GIBSON, DUNN & CRUTCHER LLP

Esther Lifshitz
elifshitz@gibsondunn.com
200 Park Avenue
New York, NY 10166
Phone: 213.229.7018

*Attorney for Defendant DoorDash, Inc.*